Jed P. White, State Bar No. 232339
*jed.white@bclplaw.com*
**BRYAN CAVE LEIGHTON PAISNER LLP**
120 Broadway, Suite 300
Santa Monica, CA 90401
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorney for Plaintiff Metal Exchange LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| METAL EXCHANGE LLC, | Case No.: 2:24-cv-00274 |
|---|---|
| Plaintiff, | **COMPLAINT FOR BREACH OF WRITTEN CONTRACT** |
| v. | |
| OLD COUNTRY MILLWORK, INC., | |
| Defendant. | |

Plaintiff Metal Exchange LLC (hereafter "Plaintiff") complains and alleges as follows:

## INTRODUCTION

1. This case involves a refusal and failure to perform by Defendant Old Country Millwork, Inc. ("OCM") of its obligations under a series of purchase agreements with Plaintiff. Through the relevant agreements, OCM ordered over one million pounds of aluminum from Plaintiff, which Plaintiff sourced from foreign suppliers for sale to OCM.

2. OCM has refused to accept delivery and to pay for approximately 1.1 million pounds of custom-made aluminum coil that it agreed to purchase from Plaintiff. While failing to honor its side of the parties' agreements, OCM asked Plaintiff to store the 1.1 million pounds of aluminum at a third-party storage facility in Southern California to allow OCM more time to accept delivery of the aluminum at its facility. In return, OCM agreed in writing to additional upward pricing adjustments per pound of the diverted aluminum.

3. Plaintiff has been storing the 1.1 million pounds of aluminum for an extended period and has been prepared to deliver the aluminum to OCM, but OCM has refused and continues to refuse to accept delivery and pay for the aluminum.

4. Prior to the filing of this action, Plaintiff made demand for full performance by OCM of its obligations to accept delivery and pay for the aluminum, but those demands have not been met. OCM has repudiated its obligations under the contracts, relieving Plaintiff from any further performance obligations to OCM and entitling Plaintiff to recover its damages.

5. Due to the custom nature of the aluminum OCM purchased, Plaintiff is unable to easily resell the aluminum to third parties at a reasonable price. Plaintiff is currently engaged in efforts to resell the stored aluminum in a commercially reasonable manner. In addition, the market value of aluminum has dropped in the intervening period since the aluminum arrived in Los Angeles and was put in storage. As a result,

Plaintiff has suffered considerable losses from OCM's refusal to accept delivery and pay for the aluminum at the agreed-upon prices. Those losses, together with Plaintiff's out-of-pocket incidental expenses and other damages, total over $800,000 and are a direct result of OCM's conduct alleged below.

## THE PARTIES

6. Plaintiff is a Missouri limited liability company with a single member, Lefton Metal Enterprises Corporation, which is a Missouri corporation with its principal place of business in Missouri. Plaintiff's principal place of business is in St. Louis County, Missouri.

7. Plaintiff is a metal transporter and distributor that plays a role in the metal supply chain by connecting raw material suppliers with processors and manufacturers of various metal-based products.

8. When the contracts relevant to the breach of contract action were formed, Plaintiff was operating as Metal Exchange Corporation ("MEC"). MEC converted to Plaintiff on December 28, 2022. All of MEC's contracts in effect at the time of the conversion, and MEC's rights under those contracts, became vested in Plaintiff.

9. Under Missouri law, Plaintiff is deemed to be the same entity as MEC after the conversion under Missouri Code Section 351.409. Pursuant to Missouri Code Section 351.409(8), all of the rights, privileges, powers, property, and causes of action belonging to MEC are vested in, and are the property of, Plaintiff.

10. OCM is a California corporation with a principal place of business in Los Angeles County, California.

11. OCM provides custom-finished aluminum and steel coils and sheets to manufacturers, fabricators, and contractors in a wide range of industries, including the commercial building, automotive, solar, electronics, and consumer appliance industries.

12. OCM represents that it specializes in custom-painted sheets and coils. According to its website, OCM "stocks a wide range of bare steel and mill finish aluminum, all ready to be painted to [the customers'] specifications."

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

14. This Court has general personal jurisdiction over OCM because it is headquartered and conducts business in this District.

15. This District and Division are the proper venue for this action under 28 U.S.C. § 1391(b) because they are the District and Division in which OCM resides and in which OCM committed the acts that are the subject of this action.

## FACTUAL ALLEGATIONS

### I. The Six Contracts Are Formed

16. Plaintiff, acting in the name of MEC and through the rights and powers of MEC now vested in Plaintiff, entered into six different sales contracts with OCM from December 2020 to March 2022, all for the purchase of aluminum coils by OCM (the "Contracts").

17. *First*, on or around December 22, 2020, OCM agreed to purchase from MEC (now Plaintiff) 176,368 pounds of aluminum coil, with an agreed quantity variance of plus or minus 10% the number of pounds purchased. The price for the purchased aluminum was to be the "LME [London Metal Exchange] Cash Settlement Average of June 2021" plus between $.71 and $.72 per pound. A true and accurate copy of this agreement is attached as Exhibit 1.

18. As reflected on the face of Exhibit 1, on or around April 21, 2021, the parties agreed to increase the sale price for this contract by $.05 per pound to account for additional freight charges.

19. On December 13, 2021, MEC (now Plaintiff) and OCM agreed via email to increase the sale price for this contract by an additional $.05 per pound to account for additional freight charges.

20. *Second*, on or around January 15, 2021, OCM agreed to purchase from

MEC (now Plaintiff) 220,460 pounds of aluminum coil, with an agreed quantity variance of plus or minus 10% the number of pounds purchased. The price for the purchased aluminum was to be the "LME Cash Settlement Average of August 2021" plus between $.84 and $.85 per pound. A true and accurate copy of this agreement is attached as Exhibit 2.

21. As reflected on the face of Exhibit 2, on or around July 27, 2021, the parties agreed to increase the sale price for this contract by $.09 per pound to account for additional freight charges.

22. On December 13, 2021, MEC (now Plaintiff) and OCM agreed via email to increase the sale price for this contract by an additional $.05 per pound to account for additional freight charges.

23. ***Third***, on or around August 5, 2021, OCM agreed to purchase from MEC (now Plaintiff) 200,000 pounds of aluminum coil. A true and accurate copy of an email exchange and purchase order sent by OCM reflecting this agreement is attached as Exhibit 3. The price for the purchased aluminum was to be $1.19 per pound plus the LME cash average for February 2022. OCM's purchase order in connection with this agreement was identified as Purchase Order #25563. The sale agreement for this order was identified by MEC (now Plaintiff) in an email to OCM as Sale Order #2098433. While the email exchange and purchase order in Exhibit 3 reflect offer and acceptance of a sale for aluminum coil at this price, the parties' subsequent conduct further confirmed that they had formed a binding contract. For instance, in subsequent emails representatives of MEC (now Plaintiff) and OCM identified these purchase order and sale order numbers and discussed the shipment of aluminum pursuant to their agreement, as well as modifications to the price agreed to on August 5, 2021. In addition, after OCM sent the purchase order in Exhibit 3, representatives of MEC (now Plaintiff) promptly notified OCM of expected shipping dates.

24. The parties also understood that their sale agreement on August 5, 2021 contained the same terms and conditions as their other contemporaneous agreements,

including an agreed quantity variance of plus or minus 10% the number of pounds purchased. At the time this agreement was made, MEC (now Plaintiff) and OCM were contemporaneously entering into many agreements for the sale and purchase of metal, and each of those other sales entailed an MEC sales order form with identical terms and conditions. Both parties' course of dealing and performance after August 5, 2021, reflects that they understood that the terms and conditions in their other contemporaneous agreements supplemented and applied to the agreement in Exhibit 3 as well. For instance, emails between MEC (now Plaintiff) and OCM after August 5, 2021, reflect that both sides understood OCM's purchase was subject to the 10% quantity variance contained in their other contemporaneous agreements.

25. On May 25, 2022, MEC (now Plaintiff) and OCM agreed via email to increase the sale price for this contract by $.0413 per pound to account for additional freight charges.

26. *Fourth*, on or around October 11, 2021, OCM agreed to purchase from MEC (now Plaintiff) 396,828 pounds of aluminum coil, with an agreed quantity variance of plus or minus 10% the number of pounds purchased. The price for the purchased aluminum was to be the "LME Cash Settlement Average of March 2022" plus between $1.30 and $1.33 per pound. A true and accurate copy of this agreement is attached as Exhibit 4.

27. On February 17, 2022, MEC (now Plaintiff) and OCM agreed via email to increase the sale price for this contract by $.075 per pound to account for additional freight charges.

28. *Fifth*, on or around November 5, 2021, OCM agreed to purchase from MEC (now Plaintiff) 176,368 pounds of aluminum coil, with an agreed quantity variance of plus or minus 10% the number of pounds purchased. The price for the purchased aluminum was to be the "LME Cash Settlement Average of April 2022" plus between $1.34 and $1.37 per pound. A true and accurate copy of this agreement is attached as Exhibit 5.

29. On June 14, 2022, MEC (now Plaintiff) and OCM agreed via email to increase the sale price for this contract by $.0452 per pound to account for additional freight charges.

30. *Sixth*, on or around March 7, 2022, OCM agreed to purchase from MEC (now Plaintiff) 264,552 pounds of aluminum coil, with an agreed quantity variance of plus or minus 10% the number of pounds purchased. The price for the purchased aluminum was to be the "LME Cash Settlement Average of July 2022" plus $1.36 per pound. A true and accurate copy of this agreement is attached as Exhibit 6.

## II.   Key Elements of the Parties' Agreements

31. For each of the Contracts, once the offshore source of the aluminum completed its processing of the aluminum and loaded the material for shipment to OCM in the United States, the actual and final amounts of aluminum to be purchased by OCM under each of the Contracts were determined, consistent with the 10% quantity variance included in the parties' agreements.

32. In total, once this final accounting was made, through the Contracts OCM collectively agreed to purchase from MEC (now Plaintiff) approximately 1.4 million pounds of aluminum coils, with direct delivery to OCM from the foreign suppliers of the metal.

33. OCM purchased the aluminum in the Contracts for the purpose of completing its custom painting and finishing services for its own customers.

34. The custom nature of OCM's purchases can be seen in the specific dimensions of the aluminum it agreed to purchase in the Contracts. Industry standard widths for aluminum coils are 36 inches, 48 inches, 60 inches, or 72 inches. Any ordered aluminum coil that differs from these standard widths is generally considered custom-made, because such aluminum coil is not widely acceptable for other common applications.

35. Each of OCM's purchases from Plaintiff was for custom aluminum coils under this standard. OCM purchased aluminum coils in a wide range of widths that

differed from the industry standards. The Contracts reflect that OCM purchased coils with widths of 22.772 inches, 25.8 inches, 31.15 inches, 33.45 inches, 35.91 inches, 36.25 inches, and 48.25 inches.

36. The Contracts all contain other key uniform terms. For each Contract the parties agreed that the aluminum would be delivered to OCM at OCM's facility at 1212 E 58th Place, Los Angeles, CA 90001.

37. Each of the Contracts also entailed an estimated shipping date. But the parties agreed that the shipping schedule for each contract was subject to timely arrival of the aluminum from its offshore source.

38. The Contracts all incorporated identical Terms and Conditions for the sales.

39. Pursuant to those Terms and Conditions, OCM was obligated to make payment to Plaintiff within 30 days after OCM received an invoice, prepared in accordance with the pricing terms in the Contracts, following delivery of the actual amounts of aluminum covered by that invoice.

40. Throughout the duration of the Contracts—and per the Contracts' terms—after Plaintiff sourced the aluminum OCM purchased, it notified OCM that it was prepared to arrange delivery of the aluminum and the amounts and timing for each delivery.

### III. OCM Breaches the Contracts

41. By around May 2022, Plaintiff had caused to be delivered to OCM and OCM had accepted delivery of approximately 300,000 pounds of the 1.4 million pounds of aluminum that OCM had collectively ordered under the Contracts. Per the pricing terms of the Contracts, OCM owed Plaintiff around $971,000 for those purchases and deliveries.

42. OCM did not make timely payment for the approximately 300,000 pounds of aluminum that was accepted for delivery by OCM. Payment in full for those deliveries was not completed until December 2022, many months after the payments were due.

43. In May 2022, OCM's Executive Vice President of Operations, Tim Kilgallon, notified representatives of Plaintiff that OCM was nearly out of space in the warehouse OCM used to accept Plaintiff's aluminum deliveries. Kilgallon asked whether Plaintiff would be willing temporarily to place future aluminum deliveries in a third-party warehouse instead of having the aluminum delivered to OCM directly. OCM stated to Plaintiff that at least part of the reason it could not accept deliveries was because of supply chain issues that prevented OCM from acquiring the paint that it needed to complete its custom metal products. That paint shortage meant that OCM's facilities were filled with metal that it had received but could not process and deliver to its own customers.

44. Plaintiff agreed to store temporarily the existing and forthcoming deliveries of aluminum in a third-party warehouse, provided that OCM agreed to a new pricing plan for the aluminum diverted to this third-party warehouse.

45. The agreement of Plaintiff and OCM for storage at a third-party warehouse and related pricing plan for the diverted aluminum was set forth in writing in exchanges of emails between the parties in May 2022. A true and accurate copy of the written agreement is set forth in the attached Exhibit 7.

46. Pursuant to the agreed-upon pricing plan, for the first 29 days in which the aluminum was diverted to the third-party warehouse, Plaintiff would charge OCM an additional $0.033 per pound of aluminum stored. After that initial period, Plaintiff would charge OCM an additional $0.0035 per pound for each 30 days the third-party stored the aluminum and it was not delivered to OCM. Tim Kilgallon confirmed via email on May 24, 2022 to Plaintiff's representatives that OCM was "in agreement" with this pricing plan.

47. Later in the summer of 2022, while OCM was no longer accepting timely deliveries and while it was delinquent in its payment obligations to Plaintiff, OCM gave a directive to Plaintiff that OCM wanted to cancel all outstanding orders. This directive was inconsistent with OCM's written agreement just months earlier to have the

1  aluminum placed in the third-party warehouse with a new pricing plan. Even more, the
2  Contracts did not allow for cancellation of deliveries by OCM.

3      48.    Throughout the rest of 2022, Plaintiff permitted OCM to continue to store
4  the aluminum at the third-party storage facility, but Plaintiff did not agree to cancel any
5  outstanding orders or alter the pricing terms in the Contracts, in hopes that OCM's
6  supply chain and customer order backlogs would be overcome, permitting OCM to take
7  delivery and satisfy its obligations under the Contracts.

8      49.    By December 2022, OCM finally had paid the outstanding balance for the
9  300,000 pounds of aluminum that had been delivered earlier that year. But OCM had
10 still not agreed to accept delivery and tender payment for the remaining 1.1 million
11 pounds of aluminum it had agreed to purchase, and which was now being diverted to the
12 third-party storage facility.

13     50.    In early 2023, Plaintiff and OCM agreed to meet to discuss the 1.1 million
14 pounds of aluminum for which OCM refused to accept delivery. That meeting occurred
15 in person at OCM's facility in Los Angeles in April 2023.

16     51.    At that meeting, Plaintiff's representatives Joe Kira and Ryan Adams met
17 with OCM's representatives Tim Kilgallon and Gerry Kilgallon (the "Kilgallons").

18     52.    The Kilgallons told Plaintiff that OCM was suffering financial difficulties
19 that were more serious than OCM had previously disclosed to Plaintiff.

20     53.    The Kilgallons stated that OCM had overbought metal products, like the
21 aluminum it purchased from Plaintiff, in 2020 and 2021, because OCM anticipated more
22 commercial business construction in those years. The Kilgallons stated that now their
23 customers had informed them that the customers had enough of the custom metal and
24 aluminum inventory to last them through 2023.

25     54.    The Kilgallons further explained that OCM had recently lost one of its large
26 clients to a competitor.

27     55.    The Kilgallons acknowledged in the meeting that Plaintiff had provided
28 OCM with "breathing room" by temporarily storing the 1.1 million pounds of aluminum

in the third-party facility.

56. After the April 2023 meeting, Plaintiff continued to wait for OCM's financial and inventory issues to improve so that OCM could honor its obligations under the Contracts. But OCM's conditions did not improve, and OCM did not agree to accept delivery and tender payment for the aluminum after the in-person meeting.

57. On July 6, 2023, Plaintiff sent OCM a detailed email, stating that Plaintiff could no longer wait indefinitely for OCM to perform under the Contracts. The email formally notified OCM that OCM was in default on the Contracts and that there existed reasonable grounds for Plaintiff's insecurity with respect to OCM's ability to perform under the Contracts. Plaintiff demanded that OCM accept delivery of the aluminum it purchased under the Contracts after providing Plaintiff with reasonable and adequate assurances prior to delivery that payment for the aluminum had been made or was secured by OCM for Plaintiff.

58. Plaintiff further notified OCM that if OCM did not comply with those terms, Plaintiff would hold OCM responsible for all of Plaintiff's losses in connection with the Contracts.

59. OCM responded to Plaintiff's July 6, 2023 email by expressing a willingness to continue further discussions with Plaintiff on a plan for the aluminum that was workable, stating that OCM felt confident that an agreement on such a plan could be reached. However, OCM did not then or thereafter propose a plan for disposition of the aluminum or take any steps to comply, in whole or in part, with the delivery and payment obligations under the Contracts. OCM also never responded to the Plaintiff's demand for adequate assurances of performance by OCM.

60. On October 2, 2023, Plaintiff sent to OCM a follow-up email confirming the continuing breach by OCM under the Contracts, causing ongoing losses to Plaintiff. Plaintiff reiterated its notice of default and its demand for adequate assurances of performance under the Contracts, specifically stating that OCM must take delivery within 30 days, in one or more lots, of all of the stored aluminum under the Contracts

while providing adequate assurances of payment through advance payment for delivered aluminum or security for payment through an acceptable and irrevocable bank letter of credit.

61. Plaintiff's October 2, 2023, email stated that a failure by OCM to take delivery and make adequate payment arrangements within 30 days would be a repudiation by OCM of each of the Contracts, thereby relieving Plaintiff of any further obligation to hold the aluminum for OCM and deliver it to OCM at a future date. Plaintiff gave further notice that, upon expiration of the 30 days, it was Plaintiff's intent to resell to other parties, to the extent reasonably practical, all of the undelivered aluminum that was in storage and identified to the Contracts.

62. Plaintiff's October 2, 2023 email to OCM further stated that Plaintiff would pursue all remedies available to it under the Contracts and applicable law, including but not limited to recovery of the prices that OCM agreed to pay for any aluminum that is not resold and/or any losses sustained by Plaintiff upon resale of any of the aluminum, plus all other lost profits, incidental damages, and attorney fees and costs that are recoverable. Plaintiff further gave notice that it would seek to hold OCM responsible for these amounts by filing suit after the expiration of 30 days.

63. OCM did not take delivery of, or make payment arrangements for, any of the stored aluminum during the 30 days after the October 2, 2023 email from Plaintiff.

64. OCM has repudiated each of the Contracts and is in breach of the Contracts.

**IV. Plaintiff's Damages as a Result of OCM's Breaches**

65. Due to OCM's repudiation and breach, Plaintiff is relieved from its obligations to hold for OCM the aluminum that is in storage and identified to the Contracts and is allowed to resell to other parties, to the extent reasonably practical, all of the undelivered aluminum that was in storage and identified to the Contracts.

66. Plaintiff is currently making reasonable and practicable efforts to resell the aluminum in storage and identified to the Contracts to third parties, on terms that are commercially reasonable. The general market price for aluminum has dropped since the

time that prices for the aluminum were established in the Contracts, which means that commercially reasonable pricing terms on the resale of the aluminum will not approach the prices that OCM agreed to pay in the Contracts. Moreover, the custom nature of the aluminum identified to the Contracts will make it more difficult for Plaintiff to find third parties willing to buy that aluminum. Plaintiff has also been bearing the cost of storing the 1.1 million pounds of aluminum for nearly 18 months, as a direct result of OCM's breaches of the Contracts.

67. Plaintiff is entitled to recovery of the prices that OCM agreed to pay in the Contracts and in the pricing plan set forth in Exhibit 7, for any aluminum that is not resold to third parties. Plaintiff is also entitled to recover any losses sustained by Plaintiff upon resale of any of the aluminum, measured by the difference between the resale prices obtained and the prices that OCM agreed to pay in the Contracts and in the pricing plan set forth in Exhibit 7. Plaintiff is also entitled to recover all other lost profits suffered by Plaintiff as a direct result of OCM's breach of the Contracts and pricing plan, to the extent allowed by law.

68. In all events Plaintiff is entitled to recover its incidental damages arising from OCM's breach, including but not limited to the costs of care and custody of the aluminum identified to the Contracts, any expenses of resale including costs to put the aluminum in saleable condition and freight charges, financing costs incurred by Plaintiff on account of the aluminum identified to the Contracts, and losses incurred on hedging transactions associated with the aluminum identified to the Contracts.

69. The Terms and Conditions of each of the Contracts includes a term providing that Plaintiff, upon filing suit for breach of the Contract by OCM, is entitled to collect reasonable attorneys' fees and costs from OCM.

70. Plaintiff has suffered damages and losses as a direct result of OCM's refusal to accept delivery and pay for 1.1 million pounds of the aluminum it purchased consistent with the terms of the Contracts and the agreed-upon pricing plan in Exhibit 7. Those damages exceed $800,000.00.

## COUNT I – BREACH OF CONTRACT

71. Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 70, as if fully set forth herein.

72. OCM contracted with Plaintiff to purchase from Plaintiff approximately 1.4 million pounds of custom-made aluminum coil, memorialized in the Contracts set forth in Exhibits 1-6. Through the Contracts, OCM agreed to accept delivery of the aluminum and tender payment for the aluminum OCM was contracting to purchase, all in accordance with the pricing, payment and delivery terms set forth in the Contracts.

73. In May 2022, Plaintiff and OCM entered into a written agreement, memorialized in Exhibit 7, for Plaintiff to divert temporarily to a third-party storage facility deliveries of aluminum that OCM had agreed to purchase under the Contracts but would not accept for delivery. In exchange for Plaintiff's willingness to divert temporarily the aluminum to a storage facility when OCM was obligated to accept delivery and tender payment for the aluminum, OCM agreed to a pricing plan that set forth additional payments per pound to be made by OCM based on the amount of time the aluminum was stored.

74. Pursuant to the terms of the Contracts, Plaintiff notified OCM when each delivery of the purchased aluminum was ready to be delivered to the place of delivery specified in the Contracts: the facilities of OCM. Plaintiff has notified OCM repeatedly that Plaintiff was prepared to deliver all of the aluminum coil that OCM purchased in the Contracts.

75. OCM has refused to accept delivery, and tender payment for, 1.1 million pounds of the aluminum it purchased, in violation of the parties' agreements. OCM also has not tendered payment to Plaintiff in accordance with the pricing plan the parties had agreed upon in their written agreement set forth in Exhibit 7.

76. OCM is in breach of its obligations under each of the Contracts and the pricing plan agreement set forth in Exhibit 7.

77. All conditions required by the Contracts and Exhibit 7 for OCM's

performance have occurred or been excused by OCM's breach. Plaintiff has performed all, or substantially all, obligations required of it under the Contracts and Exhibit 7. To the extent there are any remaining obligations, Plaintiff is excused from performing any such obligations by OCM's breach and repudiation of the Contracts.

78. As a direct result of OCM's breaches of the agreements, Plaintiff has been significantly damaged.

79. The damages recoverable by Plaintiff from OCM include but are not limited to: (1) the prices that OCM agreed to pay in the Contracts and in the pricing plan set forth in Exhibit 7, for any aluminum that is not resold to third parties; (2) any losses sustained by Plaintiff upon resale of any of the aluminum, measured by the difference between the resale prices obtained and the prices that OCM agreed to pay in the Contracts and in the pricing plan set forth in Exhibit 7; (3) the lost profits suffered by Plaintiff as a direct result of OCM's breach of the Contracts and pricing plan; (4) incidental damages arising from OCM's breach, including but not limited to the costs of care and custody of the aluminum identified to the Contracts, any expenses of resale including costs to put the aluminum in saleable condition and freight charges, financing costs incurred by Plaintiff on account of the aluminum identified to the Contracts, and losses incurred on hedging transactions associated with the aluminum identified to the Contracts; and (5) reasonable attorneys' fees and costs.

80. Plaintiff's damages collectively total over $800,000.00.

81. As a result of OCM's breaches, Plaintiff is entitled to all damages available by law in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANT OCM AS FOLLOWS:

1. Damages in an amount to be proved at trial;
2. Attorneys' fees, costs, and disbursements incurred herein;
3. Pre-judgment and post-judgment interest; and
4. All such other relief as the Court deems just and equitable.

Dated:  January 11, 2024              **BRYAN CAVE LEIGHTON PAISNER LLP**

By:  /s/ *Jed P. White*
Jed P. White
Attorney for Plaintiff Metal Exchange LLC

COMPLAINT FOR BREACH OF WRITTEN CONTRACT